UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>SHANDRA Y. OUTLAW,<br><br>                          Debtor.<br><br>JAMES BROWN,<br><br>                          Plaintiff.<br><br>v.<br><br>SHANDRA Y. OUTLAW,<br><br>                          Defendant. | Chapter 13<br>Bankruptcy No. 19 BK 03645<br>Honorable Judge Jack B. Schmetterer<br><br>Adversary No. 19 AP 00713 |

## MEMORANDUM DECISION

### INTRODUCTION

Debtor-Defendant Shandra Y. Outlaw ("Defendant") filed for bankruptcy relief under chapter 13 on February 12, 2019. Creditor-Plaintiff James Brown ("Plaintiff") objected to confirmation of the proposed chapter 13 plan on the basis that it fails to take into account his claim. Alongside the objection, Plaintiff filed the present adversary complaint seeking a declaration that his debt is excepted from discharge under 11 U.S.C. § 523(a)(2)(A) and (a)(4). In turn, Defendant objected to Plaintiff's unliquidated claim. The matters were consolidated for trial.

Trial was held over three afternoons. Following the trial, the parties were ordered to file proposed findings of fact and conclusions of law, with proposed judgment order, and to present arguments in writing. The Court, having heard the testimony of the witnesses and considered the documentary evidence presented by the parties, now makes and enters the following findings of fact and conclusions of law.

### JURISDICTION

Subject matter jurisdiction lies under 28 U.S.C. § 1334. The district court may refer bankruptcy proceedings to a bankruptcy judge under 28 U.S.C. § 157 and 28 U.S.C. § 1334, and this proceeding was thereby referred here by the District Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a). Venue lies under 28 U.S.C. § 1409.

Congress specifically delineated proceedings that the bankruptcy judges may hear and determine. 28 U.S.C. § 157(b). As to core proceeding, bankruptcy judges have statutory authority to hear and determine such matters. 28 U.S.C. § 157(b)(1). For non-core proceedings that are otherwise related to a case under the Bankruptcy Code, a bankruptcy judge may hear the matter but must submit proposed findings of fact and conclusions of law to the district court to review and enter. 28 U.S.C. § 157(c)(1). But, even if a matter is non-core, "[i]f all parties 'consent,' the statute permits the bankruptcy judge 'to hear and determine and to enter appropriate orders and judgments' as if the proceeding were core." *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 34 (2014).

Furthermore, a bankruptcy court must also have constitutional authority to enter a final judgment. *See Stern v. Marshall*, 564 U.S. 462 (2011). "[T]he question [of constitutional authority] is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Id.* at 499. Consent, whether express or implied, to a bankruptcy judge's hearing and determination of a matter is sufficient for constitutional authority to exist. *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015). Without constitutional authority, the bankruptcy judge may not enter a final judgment, but must instead submit proposed findings of fact and conclusions of law to the district court to review and enter. *Arkison*, 573 U.S. at 35.

Here, in her Answer to the Complaint, Defendant argues that this proceeding is not a core proceeding and "denies this court has the jurisdiction over the underlying liability sought by the plaintiff in this action." [Dkt. No. 25, at 1]. Yet, throughout the adversary, Defendant never sought to pursue that argument. Instead, Defendant has proceeded through trial and has submitted proposed findings of fact and conclusions of law which do not raise any arguments about the supposed lack of subject matter jurisdiction.

Nonetheless, bankruptcy jurisdiction is limited, and bankruptcy courts have an affirmative duty to establish that subject matter jurisdiction exists, even where the parties fail to do so. *In re A.G. Fin. Serv. Ctr., Inc.*, 395 F.3d 410, 412 (7th Cir. 2005); *Smith v. American Gen. Life & Accident Ins. Co.*, 337 F.3d 888, 892 (7th Cir. 2003). As such, the Court will analyze, *sua sponte*, whether subject matter jurisdiction exists. Furthermore, erring on the side of caution, despite Defendant's willingness to continue with this proceeding, it will be assumed that implied consent

2

has not been given in this case and a *Stern* challenge has been made as to whether a final judgment can be entered by this Court.

The first question is whether a bankruptcy court has subject matter jurisdiction over the claims allowance and liquidation process and over a proceeding for a determination of nondischargeability. The answer is undoubtedly yes. Section 1334 grants the district courts jurisdiction of "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). As matters of nondischargeability directly rises from title 11, they are therefore squarely within the subject matter jurisdiction of the district courts. *See* 11 U.S.C. § 523(a); *In re Blumberg*, 112 B.R. 236, 239 (Bankr. N.D. Ill. 1990). So is the claims allowance and liquidation process. *See* 11 U.S.C. § 502. This subject matter jurisdiction also exists with the bankruptcy courts, which exercise powers delegated to them by the district courts (and which has indeed been referred here by the District Court). 28 U.S.C. § 157(a), (b); N.D. Ill. Internal Operating Procedure 15(a). Accordingly, subject matter jurisdiction exists by this Court to hear these matters.

Next, the analysis turns to whether these matters are "core" within the meaning of the Section 157. *See* 28 USC § 157(a), (b). They indisputably are so. Section 157 denotes sixteen category of proceedings that are core matters. 28 USC § 157(b)(2). The claims allowance and liquidation process, and determinations of dischargeability of specific debts, are specifically listed as core proceedings. 28 USC § 157(b)(2)(B), (I). As such, these matters are core.

Finally, it is clear that constitutional authority exists to enter final judgments as to claim determinations and nondischargeability. There is no question that a resolution of a claim against a bankruptcy estate is necessarily "resolved in the claims allowance process." *Stern*, 564 U.S. at 499. Therefore, bankruptcy courts have constitutional authority to adjudicate and liquidate claims against the estate. *See In re Neely*, 608 B.R. 806, 810 (Bankr. N.D. Ill. 2019) (Lynch, J.) ("[T]he disallowance of claims is a core proceeding . . . over which the bankruptcy court has constitutional authority to enter final orders."); *see also Katchen v. Landy*, 382 U.S. 323, 329–30 (1966) ("The whole process of proof, allowance, and distribution is, shortly speaking, an adjudication of interests claimed in a res, and thus falls within the principle quoted above that bankruptcy courts have summary jurisdiction to adjudicate controversies relating to property within their possession.") (internal citations omitted). Likewise, as matters of nondischargeability also arise directly from bankruptcy, "[t]he bankruptcy court has constitutional authority to decide matters of

3

nondischargeability, as the debtor's discharge and the dischargeability of a particular debt necessarily stem from the bankruptcy itself." *In re Davis*, 608 B.R. 693, 698 (Bankr. N.D. Ill. 2019) (Barnes, T.). Accordingly, constitutional authority exists for this Court to liquidate Plaintiff's claim against the bankruptcy estate and determine its dischargeability thereof.

## FINDINGS OF FACT

Rule 8 of the Federal Rules of Civil Procedure (made applicable here by Bankruptcy Procedure 7008) states that "[i]n responding to a pleading, a party must . . . admit or deny the allegations asserted against it by an opposing party." Fed. R. Civ. P. 8(b)(1)(B). "An allegation – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the allegation is not denied." Fed. R. Civ. P. 8(b)(6).

Defendant's late Answer, [Dkt. No. 25], filed on December 12, 2019, failed to file answers to all of Plaintiff's allegations in the Complaint, which included the amended state court complaint incorporated by prior order [Bankr. No. 19-03645, Dkt. No. 71]. Counsel for Defendant was advised at multiple hearings that the state court allegations that became part of the Complaint would have to be answered, to which he stated that it would be done. However, despite his numerous reassurances, no answers were ever filed to the state court complaint. Accordingly, all of the unanswered allegations are deemed admitted. *See* Fed. R. Civ. P. 8(b)(6).

Furthermore, in accordance with the Final Pre-Trial Order, since no objections were filed by Defendant, all well pleaded facts admitted in the pleadings are admitted into evidence. [*See* Dkt. No. 21].

In addition, because Defendant also failed to file any proposed findings of fact and conclusions of law as ordered, all legal issues not presented are waived and all fact findings proposed by the other side are not disputed. [*See* Dkt. No. 21].

Therefore, on these foregoing grounds alone, the following facts are taken from the state court complaint and incorporated as part of the Findings of Fact herein. *See* Fed. R. Civ. P. 8(b)(6). Even if disregarding Defendant's failure to deny the facts alleged, Plaintiff's extensive evidence presented at trial, all of which were received into evidence without objection by Defendant, also conclusively establishes the following Findings of Fact:

1. Plaintiff was at all times relevant to the Complaint a resident of the City of Chicago, Cook County, Illinois, and a "tenant" of a residential single family detached home located at 105 W. 113" Place, in Chicago, Cook County, Illinois (the "<u>Premises</u>") within the meaning of

the Chicago Residential Landlord and Tenant Ordinance, Municipal Code of Chicago, Ch. 5, Sec. 12-030(i) (hereinafter, the "RLTO").

2. At all times relevant to the Complaint, Plaintiff had qualified for and had his rent payments partially subsidized through the Chicago Housing Choice Voucher Program.

3. Defendant was at all time relevant to the Complaint a lessor and a property managing agent of the Premises, and a "landlord" within the meaning of Sec. 5-12-030(b) of the RLTO.

4. On or about July 25, 2013, Plaintiff entered into a written Lease Agreement ("Lease") with Defendant and Barbara E. Jones (the holder of the deed of record of the Premises) (collectively, the "Lessors") for the rental of the Premises.

5. The Lease term was from August 1, 2013 to July 31, 2014, with a monthly total rent, including subsidy obligation, of $1,114.00.

6. The Lease contains two conflicting provisions. A $35.00 late fee is set forth in the "Additional Charges and Fees" section of the Lease, but in the below "Additional Agreements and Covenants" section of the same page, it is typed that "late fees or charges do not apply."

7. The typewritten terms of the Lease were added to the Lease by Defendant.

8. Under the Plaintiff's leasehold arrangement, the Lessors provided grass cutting services in the summer, snow shoveling services in the winter, paid for water and sanitation service, and performed repairs on the Premises as necessary to pass periodic property inspections by the Chicago Housing Association.

9. Subsequent to the end of the term of the Lease, Plaintiff remained as a tenant on a month to month basis, continuing to pay a rental amount together with a subsidy provided to the Lessors by the Chicago Housing Choice Voucher Program until August 31, 2016, at which time the subsidy ceased to be paid.

10. Plaintiff tendered to the Lessors at or before the commencement of the Lease a security deposit in the total amount of $1,114.00.

11. Beginning in August 2013, the share of the $1,114.00 rent that Plaintiff was responsible to pay each month was $299.00, with the Chicago Housing Choice Voucher Program paying the remaining $815.00 as a subsidy.

12. On August 1, 2014, and continuing through September 2015, the share of the rent that Plaintiff was responsible to pay each month was $970.00, and the Chicago Housing Choice Voucher Program portion being $170.00 each month.

13. On October 1, 2015, the combined contract rent and subsidy for the Premises increased to $1,200.00 per month.

14. On October 1, 2015, and continuing through February 2016, the share of the rent that Plaintiff was responsible to pay each month was $1,070.00, and the Chicago Housing Choice Voucher Program's subsidy was $130.00 each month.

15. On March 1, 2016 and continuing through August 31, 2016, the share of the rent that Plaintiff was responsible to pay each month was $954.00, and the Chicago Housing Choice Voucher Program's subsidy was $246.00 each month.

16. During the course of Plaintiff's tenancy at the Premises, the Defendant demanded and received numerous "late fees" from Plaintiff.

17. Defendant intended that Plaintiff rely on the validity of each demand for late fees made by her and Plaintiff in fact relied on them.

18. The RLTO provides that no late fee can exceed $10.00 for the first $500.00 of rent, and five percent (5%) of the remaining rent. RLTO, Sec. 5-12-140(h).

19. The RLTO also states that a provision "prohibited by this section included in a rental agreement is unenforceable. The tenant may recover actual damages sustained by the tenant because of the enforcement of a prohibited provision. If the landlord attempts to enforce a provision in a rental agreement prohibited by this section the tenant may recover two months' rent." RLTO, Sec. 5-12-140.

20. A copy of the RLTO was attached with the Lease.

21. On or about October 20, 2014, Defendant sent a letter to Plaintiff outlining late rent fees to be charged to Plaintiff by the Lessors. The letter referenced late fees of $40.00 for rent three days late, an additional $95.00 for rent five days late, and an additional $150.00 for rent ten days late.

22. On August 6, 2015, Plaintiff was charged $340.00 in late fees for the month of July 2015.

23. On August 19, 2015, Plaintiff was charged $325.00 in late fees for the month of August 2015.

6

24. In August 2015, Defendant charged Plaintiff, and Plaintiff paid, $630.00 in fees for rent paid late for the months of August and September 2015.
25. In September 2015, Plaintiff was charged $295.00 in late fees.
26. In October 2015, Plaintiff was assessed a $345.00 late fee.
27. On October 12, 2015, Defendant sent Plaintiff a text message demanding that he pay a late fee of $165.00 for the month of October.
28. To pay the late charges, Plaintiff took out pay day loans totaling at least $1,831.07.
29. On or about October 14, 2015, Plaintiff called Defendant and told her that he had his rent in the amount of $1,070.00, but didn't have the money to pay the late fee. Defendant told him that she would not accept his rent payment unless it included the full late fee.
30. On or about November 6, 2015, Plaintiff received from the Lessors a "3 Day Pay or Quit Notice," claiming $2,500.00 in past due rent and late fees were owed, and that if the payments were not received in the following three days he would be sued for eviction.
31. On or about November 15, 2015, Defendant demanded a late fee of $345.00 for October 2015 and $250.00 for November 2015.
32. Numerous texts were exchanged by the parties, many from the Defendant repeatedly demanding ever increasing late fees.
33. Late fees paid totaled $6,081.00.
34. On or about January 13, 2016, the Lessors, through counsel, filed a forcible entry and detainer complaint (the "State Eviction Complaint") against Plaintiff.
35. The State Eviction Complaint had an attached Five Day Notice as an exhibit that was never served on Plaintiff, despite its attestation that it was personally delivered.
36. The Five Day Notice did not include any language stating any specificity regarding the basis for the eviction or the tenant's opportunity to present a defense.
37. The Five Day Notice was not separately mailed to Plaintiff.
38. The State Eviction Complaint stated that Plaintiff was required to pay the full amount of the combined subsidy with his portion of the rent and did not list that the Chicago Housing Choice Voucher Program paid a subsidy.
39. The State Eviction Complaint did not state that Lessors had been refusing the actual rent from Plaintiff for months, despite his offering to pay the base rent, because his payments did not include any late fees which the Lessors had been demanding for years.

7

40. The State Eviction Complaint listed as amount "owed" for nonpayment of rent for just the two months of October and November 2015 as $3,955.00, plus late fees and costs.. Two months' rent at $1,070.00 would be $2,140.00. As a consequence, the State Eviction Complaint asked for $1,815.00 more than the rent actually that could have been conceivably owed by Plaintiff.

41. The State Eviction Complaint also attempted to enforce the Lease terms relative to attorney fees.

42. The RLTO states that no rental agreement may provide that a tenant pay for the landlord's attorney fees for a lawsuit arising out of the tenancy except if allowed by court rules or law. RLTO, Section 5-12-140(f).

43. For each month that Plaintiff lived in the Premises, through September 2015, he paid his full share of the contract rent.

44. Defendant refused to accept rent for the Premises without late fees for the months of October 2015 through and until February 23, 2016.

45. Plaintiff was informed by counsel for the Lessors, prior to hearing in the state eviction case, that the Lessors wanted him to stay in the Premises as a tenant and that he only had to pay the rent due to stay in possession of his home.

46. On February 23, 2016, Plaintiff appeared in state court unrepresented by counsel and signed an "agreed" order of possession ("State Possession Order") prepared by the attorney for the Lessors, believing he was not giving up possession of his rental and was just being given additional time to pay what the Lessors claimed was owed. By the time the State Possession Order was entered, that amount owed as stated in the order had soared to $6,000.00.

47. The State Possession Order was entered by the state court on February 23, 2016.

48. As a consequence of the State Possession Order and money judgment entered against him, Plaintiff retained counsel to vacate that order.

49. On March 18, 2016, Plaintiff, through counsel, filed a motion to quash and vacate the State Possession Order. That motion was denied on July 7, 2016.

50. Timely appeal was taken from that ruling, and the state appellate court reversed the judgment of the circuit court and remanded the case for further proceedings, with instructions that the circuit court vacate the State Possession Order.

51. The State Possession Judgment was vacated on July 25, 2018.
52. As a result of the State Possession Order having been entered against Plaintiff in February 2016, his Housing Choice Voucher was terminated, effective August 31, 2016.
53. On or about August 31, 2018, Plaintiff relinquished possession of the Premises.
54. When Plaintiff vacated the Premises, he owed no rent under the terms of his Section 8 tenancy and in accordance with the appeal bond order that was entered in the state court case.
55. Plaintiff left the Premises in good condition with only normal wear and tear.
56. Defendant did not place Plaintiff's security deposit in an interest-bearing account separate from her other assets. Rather, Defendant commingled Plaintiff's security deposit with her own funds and deposited her funds received in the same account as Plaintiff's security deposit.
57. Defendant never paid interest on Plaintiff's security deposit or provide any credit for interest.
58. Defendant never returned Plaintiff's security deposit.
59. Defendant did not provide to Plaintiff any receipts or certifications of work for any alleged repair or replacement of alleged damages to the Premises after Plaintiff left.
60. Any further findings contained in the Conclusions of Law section below will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### 1. Liquidation of Plaintiff's Claim

Plaintiff states a claim under both the RLTO and the Illinois Consumer Fraud Act. But first, it must be addressed whether late fees and charges were contractually allowed to be charged under the Lease.

Under Illinois law, a lease is to be construed to ascertain the intent of the parties. *Chicago Hous. Auth. v. Rose*, 203 Ill. App. 3d 208, 216, 560 N.E.2d 1131, 1136 (1990). If clauses conflict, it must be determined which of the conflicting clauses expresses more clearly the contract's chief objective. *Am. Fed'n of State Cty. & Mun. Employees v. State Labor Relations Bd.*, 274 Ill. App. 3d 327, 337, 653 N.E.2d 1357, 1364 (1995). "Moreover, in construing a contract, courts must give effect to the more specific clause and, in so doing, should qualify or reject the more general clause as the specific clause makes necessary." *Id.*

9

Here, the clause barring late fees and charges is more specific than the clause setting $35.00 late fees. Also, while the $35.00 late fees clause is in the form of a box template near the top of the lease, the clause stating that late fees and charges do not apply is typewritten below and additionally modifies other parts of the lease (specifically, when rent is to be paid). Therefore, it is concluded that the "additional agreements and covenants" section controls the allowability of late fees. Hence, late fees could not be charged under the Lease.

### a. The Illinois Consumer Fraud Act (the "ICFA")

The ICFA is a "regulatory and remedial statute intended to protect consumers . . . against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 669 (7th Cir. 2008) (quoting *Robinson v. Toyota Motor Credit Corp.*, 266 Ill.Dec. 879, 775 N.E.2d 951, 960 (2002)). Generally, the protections of the IFCA are limited to "consumers." The ICFA defines consumers as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." 815 ILCS 505/1(e). As the renting and management of residential properties to members of the public at large and implicates trade and commerce, the ICFA covers landlord-tenant relationships. *See Anast v. Commonwealth Apartments*, 956 F. Supp. 792, 802 (N.D. Ill. 1997) (collecting cases).

For a plaintiff to prevail on an ICFA claim, the plaintiff must "demonstrate that: (1) defendant committed a deceptive act or practice; (2) the defendant intended for the plaintiff to rely on the deception; (3) the deception happened in the course of trade or commerce; and (4) the deception proximately caused the plaintiff's injury." *Cocroft v. HSBC Bank USA, N.A.*, 796 F.3d 680, 687 (7th Cir. 2015). A demonstration of actual reliance is not required to prevail. *Id.*

Recovery can also be made for unfair as well as deceptive conduct. *Robinson*, 266 Ill.Dec. 879, 775 N.E.2d at 960. "Three considerations guide an Illinois court's determination of whether conduct is unfair under the [IFCA]: '(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers.'" *Windy City*, 536 F.3d at 669 (quoting *Robinson*, 266 Ill.Dec. 879, 775 N.E.2d at 961). The claim does not have to satisfy all three criteria for a finding of unfairness. *Id.* A finding of "deceptive practice" or "unfair act" must be determined on a case-by-case basis. *People ex rel. Fahner v. Testa*, 112 Ill. App. 3d 834, 837, 445 N.E.2d 1249, 1252 (1983).

In this case, by a failure to answer allegations, and to which the evidence conclusively demonstrated, that Defendant has committed, *inter alia*, the following unfair acts and deceptive practices:

1. Defendant wrote the Lease of the parties indicating that "late fee or charges do not apply" to Plaintiffs tenancy, and then deceptively and illegally charged late fees to Plaintiff during his tenancy, upon which Plaintiff often paid. As a result, Defendant received from Plaintiff thousands in illegal, unenforceable and unconscionable late rent fees not owed by Plaintiff which were illegal under the Defendant's own Lease.
2. Defendant as managing agent for the Premises repeatedly and deceptively misrepresented to Plaintiff that Plaintiff owed amounts for late fees which were not owed during his tenancy, upon which misrepresentations Plaintiff relied, and paid sums not owed.
3. Defendant refused receipt of rent without illegal late fees despite Plaintiff's offer to pay just the rent amount owed without the illegal late fees.
4. Defendant sued Plaintiff for eviction without legal basis, failed to comply with various procedural and notice requirements, and failed to properly credit Plaintiff for payments made.
5. Defendant illegally claimed a Chicago Housing Choice Voucher Program subsidy as damages against the Plaintiff in state court.
6. Defendant illegally enforced lease terms (attorney's fees and late fees) against Plaintiff which were prohibited under the RLTO.
7. Defendant, through state counsel, misrepresented to Plaintiff that the State Possession Order would provide that Plaintiff could continue to have possession of the Premises if payment of a certain sum of money were made, all in order to obtain from him his "agreement" to sign said order.
8. Defendant failed to return Plaintiff's security deposit, and failed to pay annual and final security deposit interest, in accordance with the RLTO.

The facts demonstrate that Defendant intended for the plaintiff to rely on the aforementioned deceptions and unfair acts, all to obtain money she was not entitled to. As the deceptive and unfair acts arose out of Plaintiff and Defendant's landlord-tenant relationship, the acts occurred in the course of commerce. Finally, as the direct and proximate result of the unfair acts or practices as aforesaid, Plaintiff suffered substantial injury and damages including, but not

11

limited to, being evicted from his home, loss of his valuable housing choice voucher, payment of illegal late rent fees not owed, becoming liable for attorney fees, expenses and costs his counsel incurred in state court to vacate the possession order and money judgment, fees and costs for pay day loans, disparagement of his credit, and damages for the inconvenience, frustration and aggravation associated with the illegal acts and misrepresentations of the Defendant, including the stress of being faced with homelessness, fear of being unable to locate alternative housing for his family, concern over how he would explain his homelessness to his children, and economic uncertainty resulting from his inability to pay the money judgment entered against him. All of the aforementioned adequately establish that Plaintiff succeeds on his cause of action under the ICFA.

Plaintiff presented evidence of damages in the amount of $6,316.00 in impermissible late charges and $1,831.07 in pay day loans to cover such late changes. That evidence was admitted into evidence without objection by Defendant.

Plaintiff has also demonstrated that he lost his housing choice voucher due to Defendant's conduct. He seeks $10,086.00 in damages for the loss of his voucher, valued at $246.00 per month, from August 2016 (the date of loss) to January 2020 (the date of the trial) for a total of 41 months. But, no support was provided for the assertion that he should be entitled to damages from the date of loss continuing up until the date of trial. Plaintiff claims he lost the voucher solely due to the eviction judgment being entered against him, but no support was shown that he attempted to obtain the voucher again when the eviction was vacated on July 25, 2018. In the absence of such support, although Defendant's conduct was the proximate cause of Plaintiff's injury, once the eviction judgment was vacated, the Court cannot conclude that Plaintiff is entitled to damages for the loss of his housing choice voucher past then. Accordingly, at $246.00 per month, from August 2016 to July 2018, the allowed loss totals $5,904.00.

Plaintiff also seeks damages for the "disparagement of his credit, and damages for the inconvenience, frustration and aggravation." But, no evidence of such damages was ever presented. As none was presented, none can be awarded. *See Perfection Corp. v. Lochinvar Corp.,* 349 Ill. App. 3d 738, 744, 812 N.E.2d 465, 470 (2004) (the party seeking damages has burden to prove damages).

In sum, under the ICFA, Plaintiff's awarded damages total $14,051.07.[1]

---

[1] ($6,316.00 + $1,831.07 + $5,904.00) = $14,051.07.

### b. The RLTO Penalties

#### i. Impermissible Late Fees Penalty of $2,228.00

In addition to being unpermitted under the Lease, all late fees charged by Defendant were not collectable under the RLTO. The RLTO was designed "to establish the rights and obligations of the landlord and the tenant in the rental of dwelling units, and to encourage the landlord and the tenant to maintain and improve the quality of housing" in the City of Chicago. RLTO, Sec. 5-12-010. Plaintiff was a tenant protected under the provisions of the RLTO, and Defendant was a lessor and a property managing agent of the Premises and a "landlord" within the meaning of the RLTO.

The RLTO sets a cap on fees for late payment of rent in the amount no more than $10.00 per month for the first $500.00 in monthly rent plus five percent (5%) per month for any amount in excess of $500.00. RLTO, Sec. 5-12-140(h). Provisions in rental provisions prohibited by the RLTO are unenforceable. *Id.*

As applied to the Lease, at the highest monthly amount Plaintiff was paying at one point, $1,070.00, the maximum amount allowed for a late fee would be $38.50.[2] Yet, Defendant consistently charged Plaintiff $40.00 or more in late fees, an amount that exceeds both the stated Lease terms and the statutory cap. Because Defendant violated Sec. 5-12-140(h) of the RLTO by charging late fees in excess of that allowed under law, the RLTO provides for a penalty of twice the Plaintiff's monthly rent, or $2,228.00. *See* RLTO, Sec. 5-12-140.

#### ii. Security Deposit Mismanagement Penalty (and the Return of the Security Deposit) Totaling $3,342.00

The RLTO sets strict requirements on how landlords are to hold security deposits. *See* RLTO, Sec. 5-12-080. Defendant violated various requirements. Specifically, she:

(a) failed to return Plaintiff's security deposit, *see* RLTO, Sec. 5-12-080(d);

(b) failed to timely pay annual interest on the security deposit to Plaintiff, *see* RLTO, Sec. 5-12-080(c);

(c) commingled Plaintiff's security deposit with her own funds, *see* RLTO, Sec. 5-12-080(a)(1); and

(d) failed to disclose the name and address of the bank into which the security deposit was held, *see* RLTO, Sec. 5-12-080(a)(3).

---

[2] ($10 + 0.05($1,070 - $500)) = $38.50.

13

Because of Defendant's failure to conform to the refund requirements, Plaintiff is entitled to the return of his security deposit money in the total amount of $1,114.00. *See* RLTO, Sec. 5-12-080(d). Because Defendant violated other requirements of Sec. 5-12-080, the RLTO provides for a penalty of twice the Plaintiff's monthly rent, or $2,228.00. *See* RLTO, Sec. 5-12-080(f)(1). As a single award is proper for multiple violations of § 05–12–080, *Krawczyk v. Livaditis*, 366 Ill. App. 3d 375, 851 N.E.2d 862 (2006), only one penalty of two times the deposit is awarded even though more than one subsection has been violated in this case.

### iii. Attempted Enforcement of Attorney Fees Clause Penalty of $2,228.00

The RLTO prohibits attempted enforcement of a provision in the lease that requires a tenant to pay a landlord's attorney fees in a lawsuit arising out of the tenancy, except as provided for by court rules, statute, or ordinance. RLTO, Sec. 5-12-140(f).

Paragraph 25(c) of the Lease provides that Plaintiff would be liable for Defendant's attorneys fee in enforcing the Lease. Because Defendant has not provided any court rule, statute, or ordinance allowing for such attorney fees, Defendant violated the RLTO when she demanded and attempted to enforce this paragraph in the Lease both in her forcible entry and detainer complaint and with her oral request of attorney fees in state court. Accordingly, Plaintiff is entitled to a penalty of twice the Plaintiff's monthly rent, or $2,228.00. *See* RLTO, Sec. 5-12-140(f).

### iv. Failure to Provide RLTO Summaries Penalty of $100.00

The RLTO mandates that a copy of the summary of the RLTO, prepared and updated periodically by the Commissioner of Housing, be attached to "each written rental agreement when any such agreement is initially offered to any tenant or prospective tenant by or on behalf of a landlord and whether such agreement is for a new rental or a renewal thereof." RLTO, Sec. 5-12-170.

Despite the duties imposed by this subsection, because Defendant failed to provide to Plaintiff annual summaries conforming to the requirements of the RLTO, she is liable for a penalty in the amount of $100.00. *See* RLTO, Sec. 5-12-170.

### c. Attorney Fees

Here, Plaintiff incurred significant liability for attorney fees and costs to vacate the State Possession Order on appeal and to obtain compensation to render him whole from the injuries proximately caused by Defendant. Those fees were required to undo the harm caused to Plaintiff,

which included a loss of his housing voucher, damage to his credit, and an eviction judgment on his record.

The RLTO provides that "[e]xcept in cases of forcible entry and detainer actions, the prevailing plaintiff in any action arising out of a landlord's or tenant's application of the rights or remedies made available in this ordinance shall be entitled to all court costs and reasonable attorney's fees." RLTO, Sec. 5-12-180. As a prevailing party, Plaintiff is entitled to all fees and costs related to the RLTO.

But what about the attorney fees and costs related to the ICFA? Under the ICFA, attorney fees may be awarded to the prevailing party. 815 ILCS 505/10a(c). The decision to do so lies within the sound discretion of the trial court. *Majcher v. Laurel Motors, Inc.*, 287 Ill. App. 3d 719, 730, 680 N.E.2d 416, 424 (1997). In considering whether to grant attorney fees, courts are to consider:

> [T]he degree of the opposing party's bad faith; the opposing party's ability to satisfy the fee award; the deterrent value of a fee award; whether the party requesting fees sought to benefit all consumers or businesses or to resolve a significant legal issue under the Consumer Fraud Act; and the relative merits of the parties' positions.

*Id.* Here, some of the factors weigh heavily in favor of granting a fee award. Defendant acted in bad faith, and the merit of her position was considerably less than that of Plaintiff's position. Awarding such attorney fees in cases similar to this would undoubtedly deter landlords from acting in bad faith against tenants. But, Defendant, having sought bankruptcy relief, is unlikely to satisfy the fee award, and Plaintiff is not seeking to benefit consumers or businesses as a whole, nor to resolve a significant legal issue under the ICFA.

The Court will exercise its discretion to grant the requested fee award related to the ICFA claim. "Generally, when a plaintiff is entitled to attorneys' fees by statute on one claim and prevails on other claims arising out of the same common nucleus of facts, the plaintiff is entitled to recover fees on all of the work done on the related claims." *Straits Fin. LLC v. Ten Sleep Cattle Co.*, No. 12 CV 6110, 2017 WL 5900280, at *1 (N.D. Ill. May 2, 2017), *aff'd*, 900 F.3d 359 (7th Cir. 2018) (citing *Uniroyal Goodrich Tire Co. v. Mut. Trading Corp.*, 1994 WL 605719, at *1 (N.D. Ill. Nov. 3, 1994), *aff'd*, 63 F.3d 516 (7th Cir. 1995)). Here, Plaintiff prevailed under his RLTO claim and is entitled to his attorney fees by statute. Because his ICFA claim arises out of the same common

nucleus of facts, Plaintiff is entitled to recover such attorney fees on the work done on the related ICFA claim.

In total, Plaintiff has provided evidence of attorney fees totaling $107,586.50 and incurred costs of $3,903.54. Defendant did not contest the reasonableness of Plaintiff's lawyers' hourly rates nor their tally of their overall hours and costs spent on the case. As such, Plaintiff is entitled to $111,490.04 in attorney fees and costs.

### 2. Nondischargeability of Plaintiff's Claim

Exceptions to discharge are to be construed strictly against a creditor and liberally in favor of a debtor. *In re Reines*, 142 F.3d 970, 973 (7th Cir. 1998). The creditor seeking to establish nondischargeability of a debt bears the burden of proof. *See Matter of Harasymiw*, 895 F.2d 1170, 1172 (7th Cir. 1990). The preponderance of the evidence standard applies to the determination of all exceptions from dischargeability. *Grogan v. Garner*, 498 U.S. 279 (1991); *see also Matter of McFarland*, 84 F.3d 943, 946 (7th Cir. 1996). Plaintiff seeks nondischargeability on two grounds, under Section 523(a)(2)(A) and (a)(4). Each category of Plaintiff's damages will be analyzed below.

#### a. Damages Related to the Late Fees, Pay Day Loans, and Housing Voucher Loss Do Not Warrant Nondischargeability under Section 523(a)(2)(A)

Section 523(a)(2)(A) of the Code excepts from discharge "any debt . . . for money . . . to the extent obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). The section describes three separate grounds: false pretenses, false representation, and actual fraud. *In re Monarrez*, 588 B.R. 838, 858 (Bankr. N.D. Ill. 2018) (Barnes, T.).

Plaintiff claims nondischargeability for representational fraud. To succeed, "a creditor must show that: (1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied." *Ojeda v. Goldberg*, 599 F.3d 712, 716–17 (7th Cir. 2010). Justifiable reliance is subjective. *Field v. Mans*, 516 U.S. 59, 73–75 (1995). "While a creditor cannot bury his head in the sand and willfully ignore obvious falsehoods, the requirement that reliance be justifiable imposes no affirmative duty to investigate unless the falsity of the representation is easily detectable." *In re Hernandez*, 452 B.R. 709, 722 (Bankr. N.D. Ill. 2011) (internal quotations and citations omitted).

16

As to the amounts relating to the late fees and pay day loans, while Plaintiff has demonstrated that Defendant made various false representations (that late fees were allowed to be charged to Plaintiff), and that these false representations were made by Defendant with knowledge of the falsity and was made with the intent to deceive, and to which Plaintiff relied on, Plaintiff has failed to demonstrate that his reliance was justifiable. Rather, the evidence shows that the falsity of the representation was easily detectable. The Lease specifically contained a section that stated that late charges and fees would not apply. Furthermore, a copy of the RLTO, which included the section regarding the unenforceability of certain late fees, was attached to the Lease. In view of the aforementioned, the falsity of Defendant's representation would have been patent upon "cursory examination" or question. *See Field*, 516 U.S. at 71. The evidence demonstrates instead that Plaintiff simply never sought to question the ever-increasing late fees charged by Defendant and paid hundreds in late fees at a time without question. Under these facts, where Plaintiff made no attempt at all to verify the allowability of accelerating late fees, reliance is not justifiable. As such, nondischargeability for the portion relating to the late fees and pay day loans is not warranted.

With regard to the housing voucher loss, the Court also cannot conclude that Plaintiff has met his burden to demonstrate nondischargeability. Plaintiff has shown that Defendant, through counsel, falsely represented to the state court that an eviction was proper. However, an eviction judgment was entered not after trial by the state court but by the State Possession Order signed by Plaintiff. Plaintiff signed that State Possession Order through counsel for Defendant's representations that Plaintiff that he would not have to give up possession of his rental home and would be given additional time to pay if the State Possession Order was entered. That statement was made with falsity, and with the intent to deceive Plaintiff to sign it so that Defendant would obtain possession of the Premises.

However, Plaintiff has not demonstrated that his reliance on Defendant's false statements and subsequent signing of the State Possession Order was justifiable. Had Plaintiff simply read the State Possession Order prior to signing, he would have noticed that the State Possession Order did not purport to provide him additional time to pay, nor did it allow him to stay at the Premises. Rather, the State Possession Order decreed that Defendant would obtain possession of the Premises and that Plaintiff was liable for $6,000.00 in rent owed and $553.99 in costs. "Generally, absent fraud, the act of signing legally signifies that the individual had an opportunity to become familiar

17

with and comprehend the terms of the document he or she signed." *Hawkins v. Capital Fitness, Inc.*, 2015 IL App (1st) 133716, ¶ 14, 29 N.E.3d 442, 446.

While it is true that Plaintiff is not skilled in the understanding of law, the State Possession Order was not a complex, multi-page document packed with legal terms. Rather, the one-page, short order clearly delineates on its face the nature of its purpose. On these facts, where Plaintiff's reliance on Defendant's oral statements was not justifiable to his signing of the State Possession Order which contained contrary terms, Plaintiff's subsequent loss of his housing voucher benefits due to the eviction judgment entered pursuant to the State Possession Order does not warrant a finding of nondischargeability.

### b. Damages Relating to the Security Deposit Mismanagement Penalty (and the Failure to Return the Security Deposit) are Nondischargeable Under Section 523(a)(4)

Section 523(a)(4) of the Bankruptcy Code provides that a debtor cannot discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]" 11 U.S.C. § 523(a)(4). In order for Plaintiff to prevail under § 523(a)(4), he must first prove that Defendant committed fraud or defalcation while acting as a fiduciary. The meaning of those terms is a question of federal law. *See In re McGee*, 353 F.3d 537, 540 (7th Cir. 2003). The RLTO provides in relevant part as follows:

> A landlord shall hold all security deposits ... in a federally insured interest-bearing account in a bank, savings and loan association or other financial institution.... A security deposit and interest due thereon shall continue to be the property of the tenant making such deposit, shall not be commingled with the assets of the landlord, and shall not be subject to the claims of any creditor of the landlord or of the landlord's successors in interest, including a foreclosing mortgagee or trustee in bankruptcy.

RLTO, Sec. 5–12–080(a). The Seventh Circuit has held that "[b]y virtue of the formal separation and ownership rules, the economic relation created by [RLTO] § 5–12–080(a) is more clearly a "fiduciary" one than is the management of a client's funds by a lawyer . . ." *McGee*, 353 F.3d at 541. Accordingly, a landlord's misuse of a tenant's security deposit under the RLTO by failing to properly hold the deposit, failing to pay interest on it, or failing to return it or provide a proper accounting of it is a "defalcation while acting in a fiduciary capacity" and is therefore a nondischargeable debt under § 523(a)(4). *In re Frempong*, 460 B.R. 189, 196 (Bankr. N.D. Ill. 2011) (Schmetterer, J.).

18

Here, Defendant fulfilled none of her fiduciary obligations under the RLTO. She failed her duty to hold the security deposit in a federally insured interest-bearing account, but rather commingled the funds. *See* RLTO, Sec. 5–12–080(a); *Lawrence v. Regent Realty Group, Inc.*, 257 Ill.Dec. 676, 754 N.E.2d 334 (2001). She failed to pay interest on Plaintiff's security deposit as required for a security deposit held for more than six months, a duty that is absolute. *See* RLTO, Sec. 5–12–080(c); *Lawrence*, 257 Ill.Dec. at 676, 754 N.E.2d at 334. She failed to return any portion of the security deposit within 45 days when Plaintiff vacated the premises (and did not provide the required detailed itemization of any damages, costs or deductions applied thereto, within the required time period). RLTO, Sec. 5–12–080(d). Accordingly, damages related to the failure to return the security deposit amount and the related mismanagement penalty are nondischargeable.

### c. The Remaining RLTO Penalties are Dischargeable

As to the RLTO penalties for the improper late fees, payday loans, attempted enforcement of lease attorney fees clause, and failure to provide RLTO summaries, Plaintiff has not met his burden of proof to demonstrate nondischargeability under either Section 523(a)(2)(A) or Section 523(a)(4).[3]

No claim was made that the attempted enforcement of lease attorney fees clause and the failure to provide RLTO summaries involve false pretenses, false representations, and actual fraud under Section 523(a)(2)(A). As to Section 523(a)(4), Plaintiff has not provided any authority establishing that Defendant committed the aforementioned violations, alongside the charging of improper late fees, while acting as a fiduciary. A cursory conclusion, without support, that she did so will not suffice. *See M.G. Skinner & Assocs. Ins. Agency v. Norman-Spencer Agency*, Inc., 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."). Unlike the amounts related to the security deposits, these violations are not tied to Defendant's role as a fiduciary related to RLTO § 5–12–080(a) to allow for a nondischargeability claim under Section 523(a)(4). Therefore, the damages relating to these portions are ineligible for nondischargeability under Section 523(a)(2)(A) or Section 523(a)(4).

---

[3] It was explained above that the damages relating to the improper late fees and payday loans fail to satisfy nondischargeability under Section 523(a)(2)(A) as Plaintiff's reliance on Defendant's false representations was not justifiable.

### d. Damages Related to the Entire Attorney Fees and Costs are Nondischargeable

When a debt is found to be nondischargeable under Section 523(a)(2)(A) or Section 523(a)(4), the entire amount of the debt is excluded from the discharge, including any attorney fees that are awarded in relation to the debt. *Frempong*, 460 B.R. at 200; *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998).

Here, debts were found to be nondischargeable under both Section 523(a)(2)(A) and (4). Accordingly, the related attorney fees and costs are also nondischargeable.

## CONCLUSION

For the foregoing reasons, Plaintiff's claim is liquidated as follows:

| | |
|---|---|
| Impermissible Late Fees | $6,316.00 |
| Pay Day Loans | $1,831.07 |
| Loss of Housing Choice Voucher | $5,904.00 |
| RLTO – Penalty for Impermissible Late Fees | $2,228.00 |
| Security Deposit and RLTO – Penalty for Mismanaged Security Deposit | $3,342.00 |
| RLTO – Penalty for Attempted Enforcement of Lease Attorney Fees Clause | $2,228.00 |
| RLTO – Penalty for Failure to Provide RLTO Summaries | $100.00 |
| Attorney Fees | $111,490.04 |
| ---------------------------- | ---------------------------- |
| Total | $133,439.11 |

Of Plaintiff's allowed claim of $133,439.11, only the damages relating to the security deposit and attorney fees, $114,832.04, are nondischargeable. A judgment order will be entered concurrently herewith to that effect.

ENTER:

_____
Jack B. Schmetterer
United States Bankruptcy Judge

Dated this \_\_\_\_ day of September 2020